[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 177 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 178 
Complainants seek to recover moneys that they paid the defendant bank from time to time through the years, beginning in 1931. The Futurity Realty Corporation had been organized the preceding October by Dr. Morris Joseph, who conveyed to it his home in Paterson and a summer place at Budd Lake. A few months later, January 19, 1931, he assigned to the corporation a half interest in a valuable lease. The consideration for these transfers was the capital stock of the company which Dr. Joseph caused to issue to his wife, either as a gift to her, or else to hold for his use. He became president and manager of the company, and Mrs. Joseph, secretary.
On April 24, 1931, the complainant company gave the bank its note for $14,500 and secured it by an assignment of the lease. The proceeds of the note were applied to a personal obligation of Dr. Joseph. That is the first transaction which is questioned. When the note fell due in three months, the company made a small payment on account and gave a new note for the balance, and so every three months until July, 1932, when a renewal note for $13,600 was made. The second transaction under attack took place November 14, 1932, when the company gave the bank its note for $15,875, payable in one month, in the place of the $13,600 note, and of another note of the company for $900. The balance of the new note, $1,375, took care of personal liabilities of Dr. Joseph. At the same *Page 179 
time, the company agreed with the bank that the lease should be held as security for the new note and also as security for a certain note of Harry Joseph, endorsed by Dr. Joseph, in the sum of $9,350, and which the company guaranteed. The agreement, of course, covered renewals.
For ten years thereafter, the two notes were renewed from month to month, with small payments made by the company on the principal of the $14,500 note. On March 11, 1943, the bank received the last of the notes, one from the company for $3,600, one from Harry Joseph endorsed by Dr. Joseph for $9,150. Just before the notes matured 30 days later, the bill of complaint in this cause was filed. Complainants were denied an interlocutory injunction against the bank's disposing of its collateral, namely the lease. Thereupon, the complainant, Mrs. Joseph, paid the bank the amount of the notes and took an assignment of the lease, and was permitted to file a supplemental bill setting up the payment. The relief presently sought is repayment by the bank of all of moneys it has received as aforesaid from the company or Mrs. Joseph, whether principal or interest.
The company does not appear to have made any payments on the Harry Joseph note. On the other note and renewals thereof, it paid to the bank, besides interest, the principal sum of $13,185, of which $900 was in satisfaction of a debt of the company incurred in its business, and $12,285 was paid on obligations of Dr. Joseph which the company had assumed or secured. A corporation generally has no power to execute an obligation for the payment of money, or to pledge its assets, as an accommodation for one of its officers. Heidler v. Werner Co.,97 N.J. Eq. 505. It has no power to give away its property.Atlantic City, etc., Co. v. Johnson, 81 N.J. Eq. 351;Deutsche Presbyterische Kirche v. Trustees of Presbytery ofElizabeth, 89 N.J. Eq. 242.
Let us first take up the consideration for the company's assumption of Dr. Joseph's debt on April 24, 1931. The properties that Dr. Joseph turned over to the company were his principal assets. He was obligated to the bank at the time as endorser of a note for $30,000, and there were other *Page 180 
debts of his to the bank, the amount of which I do not find stated in the proofs. Dr. Joseph testified, however, to a threat by the bank "of making me pay up my other obligations which I was in no financial position to do." He says that his purpose in making the transfers was "to protect my wife and family against any attack on my estate." When the bank officers learned that the debtor had transferred the greater part of his assets to a corporation and given the stock of the company to his wife, they were naturally disturbed. They demanded security and threatened to bring suit to set aside the transfers to the company as made in fraud of creditors. Finally a compromise was reached, whereby the bank forebore to sue and the company assumed Dr. Joseph's note liability to the extent of $14,500. There can be no doubt of the bona fides of the bank's alleged cause of action against the company. The compromise was a good consideration for the company's assumption of the debt. Second National Bank ofPaterson v. Curie, 116 N.J. Eq. 101 (E. A. 1934).
When the company, the next year, took over other liabilities of the doctor's in the sum of $1,375, the bank agreed to reduce the interest rate on the company's notes from six per cent to three per cent. The amount of interest saved by the company in the years following, was more than twice $1,375.
Let us assume, however, that the company's notes to the bank were not supported by a consideration. The rule that a corporation shall not give away its property is established for the benefit of creditors and stockholders. If creditors are not harmed, and all the stockholders consent, the transaction is not objectionable. City of Fort Worth v. National Park Bank,261 Fed. 817. Where the transaction has been completed, the gift made, the corporation cannot recover the money which it has paid unless some stockholder, who is in a position to do so, takes the initiative in the matter. A stockholder who consented to the payment, or who is barred by some estoppel or by laches, cannot attack the gift successfully.
The bill of complaint asserts that Mrs. Joseph owned all the stock of Futurity Realty Corporation, but a careful study *Page 181 
of her testimony and that of her husband convinces me that this was not true. Her husband, Dr. Joseph, owned the stock. He put the stock in her name for the same purpose that he had when he transferred his property to the Corporation, namely, to defraud his creditors in the event they pressed him too hard. Mrs. Joseph exercised none of the dominion that is part of beneficial title. While she was nominally secretary and treasurer and a director, she performed none of the duties belonging to these offices, but left everything to be done by her husband, who was president and a director. She never inquired, and never was given information, about the company's affairs. Mail addressed to the company that came to the Joseph home, she always placed unread and unopened on her husband's desk. It was "the doctor's corporation", as his wife characterized it. Dr. Joseph, questioned about the gift of the stock to his wife, was asked whether he handed her the certificates. He replied, "No she let me hold all her belongings, certificates and other things." He must, however, have let her have the certificates long enough to endorse them in blank, for they bear her signature on the back. They were kept with other papers relating to the company in the doctor's safe deposit box.
Even if Mrs. Joseph was the actual owner of the stock, she is estopped from contesting with the bank the transactions in suit. As far back as 1929, and continuing through 1932, Mrs. Joseph knew that her husband was greatly worried about notes held by the defendant bank. "He said he was having a lot of trouble with the bank." When the doctor and the bank had agreed that the company would make the note of April 24, 1931, for $14,500 and assign the lease as security, Dr. Joseph told his wife that she would have to sign certain papers "if she wanted to relieve me of my trouble at the bank." She consented, for "She felt sorry for my trouble." So on April 23, she certified a purported resolution of the board of directors empowering Dr. Joseph, on behalf of the company, to borrow money and make and deliver notes "without inquiry as to the circumstances of issue or the disposition of the proceeds, even if drawn to the individual order of any *Page 182 
signing officer or person, or tendered in payment of his individual obligation." The next day, Mrs. Joseph attested as secretary the assignment of the lease to the bank as security for the $14,500 note, and signed the usual affidavit that the document was the deed of the company.
Similarly in the fall of 1932, Dr. Joseph told his wife, "I was having the same difficulty at the bank and she would have to sign the paper. I was instructed by the bank she would have to sign the paper." This time she executed three documents for the bank, — a certified copy of a directors' resolution of the same tenor as before, a certified copy of a resolution of guaranty of the note for $9,350, endorsed by Dr. Morris, an agreement extending the assignment of the lease so as to cover all present and future indebtedness of the company to the bank and particularly so as to secure the $9,500 note. Mrs. Joseph testifies that she did not read any of these papers and knew nothing of the transactions. But she did know that the bank would rely on her signature and that the purpose of her signing was the relief of her husband. The bank, in reliance on Mrs. Joseph's signatures, surrendered the old notes on which her husband was liable and accepted the obligations of the company. Clearly, Mrs. Joseph is estopped from asserting any invalidity in the company's notes. Howard v. WestJersey, etc., R.R. Co., 102 N.J. Eq. 517; affirmed104 N.J. Eq. 201 (1928).
The bill is plentifully sprinkled with the words deception, fraud, coercion and duress. But the slender, factual basis for the epithets appears to be this: In the early months of 1931 and again in the fall of 1932, the bank informed Dr. Joseph that on the next due day of the paper on which he was liable as maker or endorser, he would be required to pay according to his obligation or else provide further security satisfactory to the bank. Likewise, in April, 1943, the bank told the parties it intended to enforce whatever rights it had in respect to the collateral unless the debts were paid.
To constitute duress, the threatened action must be unlawful or wrongful. "But acts may be wrongful within the meaning of this rule, though they are not criminal or tortious, *Page 183 
or in violation of a contractual duty." Rest. Contracts, sec.
492 (g); Miller v. Eisele, 111 N.J. Law 268; Hochman v.Zigler's, Inc., 139 N.J. Eq. 139; Ewert v. Lichtman,141 N.J. Eq. 34. The conduct of the bank in the transactions under review does not appear to have been wrongful in any sense. The duty which the officers of a bank owe to stockholders and depositors, requires them to take such measures as may appear to them necessary in order that the bank may not suffer loss through defaults of its debtors. There was no duress practised in this case.
It seems unnecessary to discuss the subject of ratification and laches.
Mrs. Joseph paid Harry Joseph's note and the balance due on the company's note. She made the payment with money of her husband advanced to her for the purpose. It was a voluntary payment. No reason occurs to me why she should get the money back from the bank.
The bill will be dismissed with costs.